# EXHIBIT A

1 of 3 DOCUMENTS

**WISCONSIN CENTRAL, LTD., Plaintiff-Appellee, v. CATHERINE SHANNON and NANCY MCDONALD, Defendants-Appellants.**

No. 07-3554

UNITED STATES COURT OF APPEALS FOR THE SEVENTH CIRCUIT

2008 U.S. App. LEXIS 18331

May 14, 2008, Argued
August 26, 2008, Decided

**PRIOR HISTORY:** [*1]
Appeal from the United States District Court for the Northern District of Illinois, Eastern Division. No. 07 C 994--Ruben Castillo, Judge.

**COUNSEL:** For WISCONSIN CENTRAL LIMITED, an Illinois corporation, Plaintiff - Appellee: James S. Whitehead, SIDLEY AUSTIN, Chicago, IL, USA.

For CATHERINE SHANNON, NANCY MCDONALD, Defendants - Appellants: Rachel A. Hoover, OFFICE OF THE ATTORNEY GENERAL, State of Illinois Center, Chicago, IL, USA.

**JUDGES:** Before BAUER, FLAUM, and MANION, Circuit Judges.

**OPINION BY:** FLAUM

**OPINION**

FLAUM, *Circuit Judge.* Wisconsin Central, LTD. ("WCL"), an interstate railroad company, brought a suit seeking declaratory and injunctive relief in federal court after the Illinois Department of Labor ("the IDOL") began investigating claims that WCL had violated overtime regulations under the Illinois Minimum Wage Law, *820 ILL. COMP. STAT. 105/4a.* The basis for WCL's suit was that the State's overtime provisions were preempted by federal law. This preemption argument was based on two separate grounds: (1) that enforcing the Illinois law would require interpreting provisions in WCL's collective bargaining agreements ("CBAs") and was thus preempted by the federal Railway Labor Act ("RLA"), *45 U.S.C. §§ 151-188,* which [*2] required that all CBA disputes be resolved in arbitration; and (2) that Congress's regulation of the railways was so vast that field preemption applied. On cross-motions for summary judgment, the district court found for WCL on the first preemption claim, and thus did not address the field preemption issue. For the following reasons, we find that the issue of preemption under the RLA was not ripe for consideration, but that Congress has so occupied the field of railway regulation that Illinois's overtime law is preempted as applied to the railways.

**I. Background**

WCL is a railroad that operates in Wisconsin, Minnesota, Michigan, and Illinois. In 2005, the IDOL received complaints from five WCL "signal maintainers" claiming they had been denied overtime wages owed under Illinois law. *See 820 ILL. COMP. STAT. 105/4a.* As signal maintainers, these employees fell within one of the four categories of WCL employees (which includes communications and signal employees, conductors, locomotive engineers, and maintenance-of-way employees) that work in Illinois and have entered into CBAs with the railway concerning the terms and conditions of employment.

Defendant Nancy McDonald, an IDOL compliance [*3] officer, was assigned to investigate these claims. McDonald sought to verify and corroborate the claimants' allegations. After speaking with some of the claimants, McDonald sent a letter to WCL's Illinois office on August 22, 2006, requesting the company's payroll records from September 2003 to the present for all signal maintainers. On September 5, WCL replied by letter, explaining its position that, because the signal maintainers were employed pursuant to a CBA entered into under the RLA, *45 U.S.C. § 151 et seq.,* that Act

preempted the State's overtime law. WCL received a response to this letter on January 29, 2007, in which McDonald explained that she was proceeding with her investigation since there was currently no Chief Counsel at the IDOL able to review WCL's preemption claim. McDonald also stated that if WCL did not voluntarily comply with her records request, she would subpoena the railway to compel the payroll records' production. *See 820 ILL. COMP. STAT. 105/7(c)*. Moreover, McDonald noted that the IDOL would bring enforcement proceedings against WCL under *820 ILL. COMP. STAT. 105/12* if, after her investigation, it was determined that the Illinois Minimum Wage Law's overtime [*4] provisions had been violated.

This prompted WCL to file, on February 21, 2007, a two-count suit in federal court seeking declaratory and injunctive relief. The suit, brought against McDonald and Catherine Shannon, the then-Acting Director and now Director of the IDOL, in their official capacities, claimed that enforcement of the State's overtime law against WCL was preempted by federal law. Five days later, on February 26, the IDOL issued a subpoena to WCL, seeking the time and payroll records not only for the signal maintainers, but for every WCL employee at the company from September 1, 2003 to February 28, 2007. The IDOL subsequently agreed to extend the deadline for responding to the subpoena until after the resolution of WCL's lawsuit.

On March 29, 2007, WCL amended its complaint to its present version. Count 1 sought declaratory relief, claiming that based on Congress's vast regulation of the railway industry, field preemption applied, thus barring the Illinois Minimum Wage Law's applicability to WCL. Count 2 sought to enjoin the IDOL from enforcing the Illinois Minimum Wage Law against WCL on the same grounds. Counts 3 and 4 sought the same relief as Counts 1 and 2, but on the [*5] basis that the RLA preempted Illinois's overtime law from being enforced with respect to those workers employed pursuant to a CBA.

The IDOL filed a motion to dismiss WCL's complaint on April 23, 2007. The district court converted the motion to dismiss to a motion for summary judgment, which WCL responded to with a cross-motion for summary judgment. On September 21, 2007, the district court issued a memorandum opinion and order, granting summary judgment for WCL and denying it for the IDOL. The district court found for WCL on the basis of the RLA's preemptive force, reasoning that determining whether WCL had violated Illinois's overtime provisions would require interpreting the applicable CBAs, something which the RLA mandates occur through an arbitration process outside the state or federal courts. *See Hawaiian Airlines v. Norris, 512 U.S. 246, 252-53, 114 S. Ct. 2239, 129 L. Ed. 2d 203 (1994)*. Having found for WCL on this ground, the district court did not need to determine whether field preemption also precluded the IDOL from enforcing the Illinois Minimum Wage Law against the railway. The IDOL then brought this appeal, with WCL, in its response brief, contending that this Court, if reversing the district court, could [*6] still find for the railway on the basis of field preemption.

## II. Discussion

This appeal raises two preemption issues: (1) whether the IDOL's investigation and enforcement of Illinois's overtime law is preempted by the RLA; and (2) whether field preemption precludes the State's overtime provision's applicability to the railway, on the basis of Congress's comprehensive regulation of the rail industry. Because this appeal comes to this Court from cross-motions for summary judgment, we review the district court's findings *de novo*, *Aux Sable Liquid Prods. v. Murphy, 526 F.3d 1028, 1032 (7th Cir. 2008)*. As with any summary judgment motion, this Court reviews these cross-motions "construing all facts, and drawing all reasonable inferences from those facts, in favor of . . . the non-moving party." *Automobile Mechanics Local 701 Welfare & Pension Funds v. Vanguard Car Rental USA, Inc., 502 F.3d 740, 748 (7th Cir. 2007)* (quoting *Hall v. Bodine Elec. Co., 276 F.3d 345, 352 (7th Cir. 2002))*. Here, however, because there are no genuine issue of material fact, "we need decide only whether either party 'is entitled to a judgment as a matter of law.'" *Id.* (quoting *FED. R. CIV. P. 56(c)*).

### A. Preemption [*7] Under the Railway Labor Act

The IDOL's appeal focuses upon the district court's finding that, "because the overtime claims being investigated by the [I]DOL involve interpretation and application of various provisions of the CBAs, the claims are preempted by the Railway [Labor] Act." *Wis. Cent. Ltd. v. Shannon, 516 F. Supp. 2d 917, 925 (N.D. Ill. 2007)*. The Supreme Court addressed the RLA's preemptive scope most recently in *Hawaiian Airlines v. Norris, 512 U.S. 246, 114 S. Ct. 2239, 129 L. Ed. 2d 203 (1994)*, [1] where the Court explained the Act in the

following manner:

> Congress' purpose in passing the RLA was to promote stability in labor-management relations by providing a comprehensive framework for resolving labor disputes. To realize this goal, the RLA establishes a mandatory arbitral mechanism for "the prompt and orderly settlement" of two classes of disputes. The first class, those concerning "rates of pay, rules or working conditions," are deemed "major" disputes. . . . The second class of disputes, known as "minor" disputes, "grow out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." Minor disputes involve "controversies over the meaning [*8] of an existing collective bargaining agreement in a particular fact situation." Thus, "major disputes seek to create contractual rights, minor disputes to enforce them."

*512 U.S. at 252-53* (internal citations omitted). Accordingly, because the RLA requires that all "minor" disputes be resolved through "a mandatory arbitral mechanism," if the alleged overtime violations under Illinois law are in essence a "minor" dispute involving the CBAs, then the IDOL's state overtime claims are preempted. *Id. at 253*. Despite this mandatory arbitration process, however, the Court made clear in *Hawaiian Airlines* that "substantive protections provided by state law, independent of whatever labor agreement might govern, are not pre-empted under the RLA." *Id. at 257*. Instead, the Court reaffirmed its prior decision in *Lingle v. Norge Div. of Magic Chef, Inc., 486 U.S. 399, 108 S. Ct. 1877, 100 L. Ed. 2d 410 (1988)*, reiterating that "where the resolution of a state-law claim depends on an interpretation of the CBA, the claim is preempted," but explaining that certain claims may involve "'purely factual questions' . . . [that] do not 'require a court to interpret any term of a collective-bargaining agreement,'" and thus are not preempted. *Id. at 261-62* [*9] (quoting *Lingle, 486 U.S. at 407*).

    1 In 1936, the RLA was amended to expand the Act's applicability to the airline industry, in addition to the railroads. *Hawaiian Airlines, 512 U.S. at 248* (citing Act of Apr. 10, 1936, ch. 166, 49 Stat. 1189 (codified as amended at *45 U.S.C. §§ 181-188*)).

In keeping with *Hawaiian Airlines*, this Court has affirmed, on a number of occasions, that preemption (or "preclusion" if a federal claim is brought) [2] under the RLA exists when "the success of the claim is dependent upon an interpretation of the collective bargaining agreement's terms." *Miller v. Am. Airlines, Inc., 525 F.3d 520, 524 (7th Cir. 2008)* (citing *Brown v. Ill. Cent. R.R., 254 F.3d 654, 664 (7th Cir. 2001)* ("[T]he best way to harmonize these two statutes [the RLA and the ADA] is to allow a plaintiff employee to bring an ADA claim in federal court against his employer (even if his employment is governed by a collective bargaining agreement which is subject to the RLA), unless the resolution of his ADA claim requires the court to interpret the collective bargaining agreement's terms as a potentially dispositive matter.") and *Tice v. Am. Airlines, Inc., 288 F.3d 313, 318 (7th Cir. 2002)* ("providing [*10] that dismissal is appropriate where 'a particular interpretation of the collective bargaining agreement is potentially dispositive of a the plaintiff's claim'")); *see also In re Bentz Metal Prods. Co., 253 F.3d 283, 285 (7th Cir. 2001)* (holding, with respect to the parallel preemption provision in § 301 of the Labor Management Relations Act ("LMRA"), *29 U.S.C. § 185(a)*,"that a state law claim is not preempted if it does not require interpretation of the CBA even if it may require reference to the CBA"). Accordingly, this Court has identified many scenarios where CBAs may be implicated as part of a state or federal cause of action, but preemption/preclusion of the claim is unnecessary. Such examples include: (1) when "the particular contractual provision is so clear as to preclude all possible dispute over its meaning," *Baker v. Kingsley, 387 F.3d 649, 658 (7th Cir. 2004)* (quoting *Metalcrafters v. McNeil, 784 F.2d 817, 824 (7th Cir. 1986))*; (2) if "the parties d[o] not dispute the interpretation of the relevant CBA provisions," *Brown, 254 F.3d at 668*; or (3) where reference to the CBA is only necessary for computing damages. *See In re Bentz Metal Prods. Co., 253 F.3d at 286-87* (discussing [*11] *Livadas v. Bradshaw, 512 U.S. 107, 114 S. Ct. 2068, 129 L. Ed. 2d 93 (1994))*.

    2 This Court has found "the preemption question sufficiently similar to the preclusion question to make the analysis employed in the RLA preemption cases applicable" in preclusion cases

as well. *Brown v. Ill. Cent. R.R.*, 254 F.3d 654, 662 (7th Cir. 2001).

The district court, in its analysis, focused upon whether resolving an overtime claim brought by the IDOL against WCL "would require the application or interpretation of the CBAs." *Wisconsin Central, Ltd.*, 516 F. Supp. 2d at 922. The court found that such interpretation would be necessary, observing that computing overtime under Illinois law requires ascertaining the number of "hours worked" and the "regular rate of pay"; figures that could only be calculated by turning to the CBAs, and were not so clear under those agreements that they could be determined through a "mere 'glance'" without interpretation. [3]

---

[3] The overtime provision in Illinois's Minimum Wage Law provides that:

> [N]o employer shall employ any of his employees for a workweek of more than 40 hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than 11/2 times [*12] the regular rate at which he is employed.

820 ILL. COMP. STAT. 105/4a(1). In determining whether this overtime law has been violated, it is necessary to calculate the "hours worked," which is defined as:
> all the time an employee is required to be on duty, or on the employer's premises, or at other prescribed places of work, and any additional time he or she is required or permitted to work for the employer,

ILL. ADMIN. CODE tit. 56, § 210.110, as well as the "regular rate" of pay, the formula for which varies depending upon the manner in which the employee is compensated, ILL. ADMIN. CODE tit. 56, § 210.430 (differing calculations for employees paid on an hourly rate, "piece-rate" employees, salaried employees, and others), and includes multiple exclusions. ILL. ADMIN. CODE tit. 56, § 210.410 (such as "when no work is performed due to a vacation, holiday, illness, failure of employer to provide sufficient work, or other similar cause"). The CBAs at issue in this case contain numerous provisions potentially relevant to calculating the "hours worked" and "regular rate" of pay, such as clauses pertaining to meal periods, on-call time, and travel time, among others.

---

The main thrust of the [*13] IDOL's appeal is that the district court failed to take the extra step of determining whether, at this stage of the proceedings, it was evident that an interpretation of WCL's CBAs would be "*dispositive*" of liability in an overtime claim brought under Illinois law. Referencing the examples given above where this Court has noted that preemption/preclusion would be unnecessary, the IDOL argues that, particularly since as of right now, at the investigation stage, there is no dispute between the parties as to the CBAs' terms as applied to the Illinois Minimum Wage Law, the district court's judgment was premature and overbroad. This argument is strikingly similar to a claim that this suit is not ripe for review, but the IDOL specifically argued in its brief to this Court that this suit is ripe for adjudication. This Court, however, is "obligated to consider [its] jurisdiction at any stage of the proceedings," *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 935 (7th Cir. 2008) (quoting *Enahoro v. Abubakar*, 408 F.3d 877, 883 (7th Cir. 2005)), and ripeness, when it implicates the possibility of this Court issuing an advisory opinion, is a question of subject matter jurisdiction under the case-or-controversy [*14] requirement. *Meridian Sec. Ins. Co. v. Sadowski*, 441 F.3d 536, 538 (7th Cir. 2006).

Ripeness is predicated on the "central perception . . . that courts should not render decisions absent a genuine need to resolve a real dispute," *Lehn v. Holmes*, 364 F.3d 862, 867 (7th Cir. 2004) (quoting 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 3532.1, at 114 (2d ed. 1984)), and "[c]ases are unripe when the parties point only to hypothetical, speculative, or illusory disputes as opposed to actual, concrete conflicts." *Id.* (quoting *Hinrichs v. Whitburn*, 975 F.2d 1329, 1333 (7th Cir. 1992)). The inquiry into ripeness is made more complicated when suit is brought under the Declaratory Judgment Act, 28 U.S.C. § 2201, and hence seeks preemptive relief, but the ability to bring suit under that Act does not vitiate the constitutional requirement that the claim address "a case of actual controversy."

*Deveraux v. City of Chicago*, 14 F.3d 328, 330-31 (7th Cir. 1994). This Court has acknowledged that "the distinction between a 'controversy' in the Article III sense and an abstract question of law 'is necessarily one of degree, and it would be difficult, if it [*15] would be possible, to fashion a precise test for determining in every case whether there is such a controversy.'" *Id. at 330* (quoting *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S. Ct. 510, 85 L. Ed. 826 (1941)). The Supreme Court, however, has tried to clarify this standard, recently reiterating that, "[b]asically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 S. Ct. 764, 771, 166 L. Ed. 2d 604 (2007) (quoting *Maryland Casualty Co.*, 312 U.S. at 273).

In trying to ascertain whether WCL's preemption suit under the RLA is of "sufficient immediacy and reality" to warrant review by this Court at this time, we are guided by the Supreme Court's decision in *Abbott Labs*, where the Court stated that "ripeness determinations depend on 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Metro. Milwaukee Ass'n of Commerce v. Milwaukee County*, 325 F.3d 879, 882 (7th Cir. 2003) (quoting *Abbott Labs v. Gardner*, 387 U.S. 136, 149, 87 S. Ct. 1507, 18 L. Ed. 2d 681 (1967)). [*16] With respect to the first requirement, whether this issue is fit for judicial review, this is not the case here, based upon the nature of WCL's preemption claim under the RLA. Issues of express or field preemption are generally purely legal questions, where the matter can be resolved solely on the basis of the state and federal statutes at issue. *See, e.g., id. at 882* (issue ripe for consideration where "almost purely legal issues" raised regarding whether a county ordinance was preempted by the National Labor Relations Act, 29 U.S.C. §§ 151 et seq.); *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983) (noting, in finding a preemption claim ripe for review, that "[t]he question of pre-emption is predominantly legal"). This is not the case, however, for preemption questions under the RLA, or its parallel provision in § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. *See Hawaiian Airlines*, 512 U.S. at 260 (describing these standards as "virtually identical"). As explained by this Court in *In re Bentz Metal Prods Co.*, the question of whether a state law is preempted by virtue of a CBA, "requires [a] case-by-case factual analysis to [*17] determine the extent to which a state law claim will require interpretation of a CBA." 253 F.3d at 285 (discussing preemption under § 301 of the LMRA).

Here, the record is not sufficiently developed for this Court to engage in this "case-by-case factual analysis." This Court's precedent reflects that state law is only preempted if the resolution of the claim "is dependent upon an interpretation of the collective bargaining agreement's terms." *Miller*, 525 F.3d at 524. At this stage of the proceedings, all that is clear is that the CBAs will have to be consulted to calculate the "hours worked" and "regular rate" of pay under the Illinois Minimum Wage Act. While this information was sufficient for the district court to determine that computing these values "requires interpretation and application of various provisions contained in the CBAs," *Wis. Cent. LTD.*, 516 F. Supp. 2d at 924, the parties have not yet staked out a position for the record as to what these CBA provisions mean, making it impossible to determine at this stage of the proceedings whether a disagreement will exist that will require an arbitrator, under the terms of the RLA, to engage in this CBA interpretation.

As part of [*18] its finding that Illinois's overtime provision was preempted, the district court incorrectly placed reliance upon language in *In re Bentz Metal Prods. Co.*, which states that, "[i]f the entitlement to wages (or other employee pay) or the amount due were at issue, the CBA would control; almost certainly, interpretation of the agreement would be necessary and would be subject to the arbitration procedures in the contract." 253 F.3d at 289. What the district court did not take into account is that the reason the entitlement to wages and the amount due were *not* at issue in that case was because "that sum [was] undisputed" between the parties. *Id. at 287*. Here, the IDOL's investigation of WCL's overtime practices has not progressed to a point where it can be determined what dispute, if any, the parties will have over the CBAs' terms. Because preemption under the RLA will only occur if the parties dispute the CBAs' terms, and even then, arguably only if the dispute is relevant as to liability as opposed to damages, the record is not sufficiently developed for this Court to engage in the case-by-case factual analysis required by *In re Bentz Metal Prods. Co.*

The second requirement under *Abbott* [*19] *Labs* for determining ripeness--"the hardship to the parties of withholding court consideration," *Abbott Labs, 387 U.S. at 149*--is similarly not met in this case. As a general matter, it is typically no bar to ripeness if the government has only threatened enforcement, rather than actually brought a lawsuit. See *MedImmune, Inc., 127 S. Ct. at 772* ("where threatened action by government is concerned, we do not require a plaintiff to expose himself to liability before bringing suit to challenge the basis for the threat"); *see also Nat'l Metalcrafters v. McNeil, 784 F.2d 817, 822 (7th Cir. 1986)*. This situation is unique, however, since the preemptive sweep of the RLA is focused upon "providing a comprehensive framework for resolving labor disputes," *Hawaiian Airlines, 512 U.S. at 252*, and does not reach "substantive protections provided by state law, independent of whatever labor agreement might govern." *Id. at 257*. Thus, the hardship to WCL is not its need to comply with the State's overtime requirements or the current investigation, but is rather the possibility that it will need to defend itself in an enforcement action ultimately preempted due to the need for an arbitrator, rather [*20] than a court, to interpret the CBAs, in accord with the RLA. Of course, as our sister Circuit has observed, "if it is evident that the result of a process must lead to . . . preemption, it would defy logic to hold that the process itself cannot be preempted and that a complaint seeking that result would not raise a ripe issue." *NE Hub Partners, L.P. v. CNG Transmission Corp., 239 F.3d 333, 348 (3rd Cir. 2001)*. That court, however, was quick to note that:

> We are not holding that any claim of process preemption necessarily is ripe so that the court should consider the preemption claim before the process is completed. It well may be that in a particular case when conflict preemption is implicated the court may conclude that it reasonably can be anticipated that the process will yield a result that is not preempted.

*Id. at 349 n.18*. Here, the claim that the IDOL's investigation should be halted based upon the preemptive scope of the RLA is not ripe for consideration, since this is not a circumstance where the IDOL's investigation and subsequent enforcement of the State's overtime laws would invariably lead to a finding of preemption. As discussed above, even if the IDOL brought suit against [*21] WCL under the Illinois Minimum Wage Act, scenarios exist where it would be unnecessary for the CBAs to be interpreted in order to resolve the claim. Accordingly, the district court lacked jurisdiction to rule on WCL's counts concerning preemption under the RLA.

## B. Field Preemption

This Court "may affirm the district court's grant of summary judgment on a ground other than that relied upon by the district court below, so long as the alternative basis finds adequate support in the record." *Bombard v. Fort Wayne Newspapers, 92 F.3d 560, 562 (7th Cir. 1996)* (citing *Meredith v. Allsteel, Inc., 11 F.3d 1354, 1358 (7th Cir. 1993))*. Thus, even though the district court only ruled on whether the RLA preempted the Illinois Minimum Wage Law as applied to WCL, we turn to examine WCL's alternate claim--that field preemption bars the states from regulating railroad overtime wages.

Ripeness does not pose an obstacle to this Court hearing this claim. See *Abbott Labs, 387 U.S. at 149* (whether an issue is ripe for review depends upon "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration"). Unlike the factual, case-by-case analysis required for [*22] determining preemption under the RLA, *In re Bentz Metal Prods. Co., 253 F.3d at 285*, field preemption is a purely legal question, *see Pac. Gas & Elec. Co., 461 U.S. at 201*, limited to an analysis of the Illinois Minimum Wage Law and federal statutes governing the railways. Furthermore, in addition to the record being sufficiently developed for review on this issue, there is also a hardship to WCL if this Court does not hear this claim at this time. The IDOL has threatened to enforce Illinois's overtime law against WCL--enforcement that would be completely barred if this Court were to find field preemption to exist. Moreover, even if the IDOL ultimately did not bring suit against WCL, its investigation alone drains WCL's resources, and there would be no basis for the IDOL to investigate these overtime claims if field preemption is applicable.

The preemption doctrine is grounded in the *Constitution's Supremacy Clause*, which provides that, "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the Supreme Law of the land." *Hoagland v. Town of Clear Lake, 415 F.3d 693, 696 (7th Cir. 2005)* (quoting *U.S. Const., art. VI, cl. 2*). Field [*23] preemption does not rest on an express congressional provision, or a conflict

between federal and state law, *see id.*, but instead occurs "if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.'" *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S. Ct. 2608, 120 L. Ed. 2d 407 (1992) (quoting *Fidelity Federal Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982)).

The long history of pervasive congressional regulation over the railway industry is undeniable, and the Supreme Court has observed that, "[r]ailroads have been subject to comprehensive federal regulation for nearly a century." *United Transp. Union v. Long Island R.R. Co.*, 455 U.S. 678, 687, 102 S. Ct. 1349, 71 L. Ed. 2d 547 (1982). These laws have touched on nearly every aspect of the railway industry, including property rights, [4] shipping, [5] labor relations, [6] hours of work, [7] safety, [8] security, [9] retirement, [10] unemployment, [11] and preserving the railroads during financial difficulties, [12] as was well-documented by the Sixth Circuit in its decision addressing the very issue now before this Court. *R.J. Corman R.R. Co. v. Palmore*, 999 F.2d 149, 151-52 (6th Cir. 1993).

    4  Pacific Railroad [*24] Act of 1862, ch. 120, 12 Stat. 489 (granting rights of way to construct a rail line).
    5  Interstate Commerce Act of 1887, 24 Stat. 379 (creating the Interstate Commerce Commission (ICC) to regulate rail shipping).
    6  Railway Labor Act of 1926, 44 Stat. 577 (codified as amended at *45 U.S.C. §§ 151-188*).
    7  This includes the Hours of Service Act of 1907, 34 Stat. 1415 (codified as amended at *49 U.S.C. §§ 21101-21108*) and the Adamson Act of 1916, 39 Stat. 721 (codified as amended at *49 U.S.C. § 28301*). The purpose of the Hours of Service Act was "to promote safety in operating trains by preventing the excessive mental and physical strain which usually results from remaining too long at an exacting task," *Chicago & A. R. Co. v. United States*, 247 U.S. 197, 199, 38 S. Ct. 442, 62 L. Ed. 1066 (1918), while the Adamson Act was passed in response to a threatened strike and permanently set eight hours as a day's work, while temporarily limiting wage adjustments. *Wilson v. New*, 243 U.S. 332, 37 S. Ct. 298, 61 L. Ed. 755 (1917).
    8  Safety Appliance Act of 1893, 27 Stat. 531 (codified as amended in scattered sections of 49 U.S.C.); Boiler Inspection Act of 1911, 36 Stat. 913 (codified as amended in scattered sections of 49 U.S.C.); Federal Railroad Safety Act of 1970, [*25] 84 Stat. 971 (codified as amended at *49 U.S.C. § 20101 et seq.*).
    9  *49 U.S.C. § 20106* ("regulations, and orders related to railroad security shall be nationally uniform to the extent practicable").
    10  Railroad Retirement Act of 1974, 88 Stat. 1305 (codified as amended at *45 U.S.C. § 231 et seq.*).
    11  Railroad Unemployment Insurance Act of 1938, 52 Stat. 1094 (codified as amended at *45 U.S.C. § 351 et seq.*).
    12  Regional Rail Reorganization Act of 1973, 87 Stat. 985 (codified as amended at *45 U.S.C. § 701 et seq.*) (combined bankrupt railroads into the Consolidated Rail Corporation).

Moreover, much of this federal legislation has been found to preclude state regulation over the railways. For example, as has already been discussed, the RLA's goal of "providing a comprehensive framework for resolving labor disputes," preempts state-law actions that would require interpreting a CBA. *Hawaiian Airlines*, 512 U.S. at 252-53. Congress has also expressly preempted state laws relating to railroad safety and security, unless the specific subject-matter has not yet been regulated by a federal agency, or if such a regulation is necessary to address a uniquely local hazard. *49 U.S.C. § 20106*. Going farther back [*26] in history, the Supreme Court, in 1914, held that the Hours of Service Act, which was intended to limit the number of consecutive hours worked by railway employees out of safety concerns, *see Chicago & A. R. Co. v. United States*, 247 U.S. 197, 199, 38 S. Ct. 442, 62 L. Ed. 1066 (1918), preempted state regulation in this area. *Erie R. Co. v. New York*, 233 U.S. 671, 683, 34 S. Ct. 756, 58 L. Ed. 1149 (1914) ("[T]he 'Hours of Service' law of March 4, 1907, is the judgment of Congress of the extent of the restriction necessary. It admits of no supplement; it is the prescribed measure of what is necessary and sufficient for the public safety and of the cost and burden which the railroad must endure to secure it.").

The IDOL acknowledges that there is a great quantity of federal railway legislation and that certain railroad-related laws have a preemptive effect, but maintains that Congress has not sufficiently expressed its

"clear and manifest" intent that Illinois's overtime law be preempted as applied to the railroads, particularly since wages are an area traditionally left to state regulation. *See English v. General Elec. Co.*, 496 U.S. 72, 79, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990) ("'Where . . . the field which congress is said to have pre-empted' includes areas that have 'been [*27] traditionally occupied by the States,' congressional intent to supersede state laws must be 'clear and manifest.'") (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S. Ct. 1305, 51 L. Ed. 2d 604 (1977)); *see also Frank Bros. v. Wis. DOT*, 409 F.3d 880, 887 (7th Cir. 2005) ("establishment of prevailing wage rates and labor standards for indigenous workers is an area of traditional state regulation"). In support of its position, the IDOL primarily relies upon the Supreme Court's decision in *Terminal Railroad Association v. Brotherhood of Railroad Trainmen*, where the Court determined that a state requirement that all trains have cabooses (for the "health, safety, and comfort of the rear switchmen") was not preempted by the Boiler Inspection Act, the Safety Appliance Act, the Interstate Commerce Act, or the RLA. 318 U.S. 1, 3-6, 63 S. Ct. 420, 87 L. Ed. 571 (1943). The IDOL contends that WCL's field preemption argument is foreclosed by the Court's holding that "the enactment by Congress of the Railway Labor Act was not a preemption of the field of regulating working conditions themselves and did not preclude the State of Illinois from making the order in question." *Id. at 7*. As WCL correctly points out, however, the fact that the RLA "does [*28] not undertake governmental regulation of wages, hours, or working conditions," *id. at 6*, does not mean that Congress has not manifested its intent to preclude states from enforcing its overtime laws against the railroads in other statutes. The question then, is whether, by examining Congress's expansive regulation of the railways and the preemptive force of particular laws, it can be said that Congress has manifested its intent that states be precluded from enacting and enforcing overtime provisions against the railroads. We find that this is the case.

Despite Congress's comprehensive federal regulation of the railways and the preemptive sweep of many of these laws, the IDOL tries to defeat WCL's claim by arguing that Congress has never sought to preempt state laws concerning wages, and instead has limited its preemptive intent to the resolution of labor disputes, *Hawaiian Airlines*, 512 U.S. at 252-53, matters of rail safety, *see* Hours of Service Act of 1907, 34 Stat. 1415 (codified as amended at 49 U.S.C. §§ 21101-21108); *see also* Federal Railroad Safety Act of 1970, 84 Stat. 971 (codified as amended at 49 U.S.C. § 20101 et seq.), and unemployment insurance, 45 U.S.C. § 363(b). While [*29] WCL counters that this "broad panoply" of federal legislation evinces a similar intent on Congress's part to preempt state regulation of overtime wages, the IDOL is correct that Congress's preemptive intent is more readily apparent with respect to these other subject matters than it is with respect to overtime wages. This, however, is unsurprising, given that the preemptive statutes referenced above all sought to affirmatively impose a uniform federal standard over a specific area, while with overtime wages, the contention is that Congress intended to leave that matter completely unregulated, and left solely to private negotiations between the railroads and its employees.

Of course, the mere absence of federal legislation with respect to overtime wages is not enough to find a congressional intent to preempt this field, since "[t]here is no federal pre-emption in vacuo, without a constitutional text or a federal statute to assert it." *Puerto Rico Dep't of Consumer Affairs v. Isla Petroleum Corp.*, 485 U.S. 495, 503, 108 S. Ct. 1350, 99 L. Ed. 2d 582 (1988). But, "[w]here a comprehensive federal scheme intentionally leaves a portion of the regulated field without controls, then the pre-emptive inference can be drawn--not [*30] from federal inaction alone, but from inaction joined with action." *Id.* Such is the case here. In 1916, Congress passed the Adamson Act, which permanently established the eight-hour work day for determining the compensation for railroad employees, while leaving the matter of compensation to private negotiations following a temporary wage-freeze. Adamson Act of 1916, 39 Stat. 721 (codified as amended at 49 U.S.C. § 28301). As discussed by the Supreme Court in *Wilson v. New*, a case decided the year after the Adamson Act was enacted, this law was passed after the President petitioned Congress to take legislative action to avert a country-wide strike by all railroad employees. 243 U.S. 332, 340-43, 37 S. Ct. 298, 61 L. Ed. 755 (1917). The impetus for the threatened strike was a demand by employees that the completion of 100-mile tasks be reduced from a standard ten-hour day plus extra pay for additional time, to an eight-hour day with overtime wages at time and a half. *Id. at 340*. The law passed by Congress permanently established the eight-hour workday for railroad employees, while freezing wages for a maximum of ten months, pending a commission's report on the eight-hour workday's impact on the railways. [13] *Id. at 343-46* [*31] (citing the

Adamson Act of September 3, 5, 1916, 39 Stat. 721, c. 4361). In *Wilson,* the Supreme Court, in affirming the constitutionality of this temporary wage freeze, observed that Congress intended the wage provision to be "not permanent but temporary, leaving the employers and employees free as to the subject of wages to govern their relations by their own agreements after the specified time." *Id. at 345-46.*

13   This wage freeze provision stated:

> That pending the report of the commission herein provided for and for a period of thirty days thereafter the compensation of railway employees subject to this Act for a standard eight-hour workday shall not be reduced below the present standard day's wage, and for all necessary time in excess of eight hours such employees shall be paid at a rate not less than the pro rata rate for such standard eight-hour workday.

*Wilson, 243 U.S. at 344* (quoting the Adamson Act of September 3, 5, 1916, 39 Stat. 721, c. 436).

Based on this precedent, the issue of overtime wages for railroad employees is not an area where Congress has simply neglected to act or "withdrawn from all substantial involvement." *See Puerto Rico Dept. of Consumer Affairs, 485 U.S. at 503.* [*32] Instead, the Supreme Court has found that it was Congress's intent that railroad employers and employees negotiate the issue of wages, including overtime pay beyond the eight-hour mark, "free" from regulation, following Congress' temporary restraint on wage adjustments.

The IDOL argues that this reading of the Adamson Act is too broad, and fails to appreciate that the law was passed in response to a unique and particularized threat to railway operations. While we recognize that the threatened strike was the catalyst for passing the law, the Act's scope now reaches beyond the dispute giving rise to its enactment, as evidenced by the fact that the law remains in effect nearly a century later. *See* Act of Oct. 11, 1996, Pub. L. No. 104-287, Oct. 11, 1996, 110 Stat. 3394 (codifying the Adamson Act, without substantive changes, at *49 U.S.C. § 28301*). Accordingly, Congress's intent to leave the matter of wages subject to private negotiations, as articulated by the Court in *Wilson,* particularly when placed against the backdrop of Congress's pervasive regulation of the railways and its clear intent that much of this regulation allow for no state supplement, leads us to conclude that Illinois's [*33] overtime regulations, as applied to interstate railways, are preempted. 14

14   Our decision is consistent with the Sixth Circuit's opinion fifteen years ago in *R.J. Corman Railroad Co.,* which "h[e]ld that the congressional purpose behind the Adamson Act and Congress's longstanding decision to regulate railroads on a national level make it reasonable to infer that Congress has impliedly preempted the area of overtime regulation for railroad employees." *999 F.2d at 154.* Although we recognize that arguments of congressional acquiescence are generally deserving of little weight, *see Leal-Rodriguez v. INS, 990 F.2d 939, 951 n.16 (7th Cir. 1993)* (citing *Patterson v. McLean Credit Union, 491 U.S. 164, 175 n.1, 109 S. Ct. 2363, 105 L. Ed. 2d 132 (1989)),* that is not exclusively the case, *see United States v. Sanapaw, 366 F.3d 492, 495 (7th Cir. 2004)* ("Congress's thirty-year acquiescence to a definition of marijuana that includes all Cannabis containing THC indicates that the courts have properly interpreted the Act."), and we thus note that for fifteen years, the Sixth Circuit's opinion has persisted without meriting a response by Congress. In fact, three years after our sister Circuit found that the Adamson Act provided the [*34] primary basis for finding state overtime regulation of the railways preempted, Congress, rather than clarifying or revising the preemptive scope of the Adamson Act, instead codified that law at *49 U.S.C. § 28301,* as part of an Act "[t]o codify without substantive change laws related to transportation and to improve the United States Code." Act of Oct. 11, 1996, Pub. L. No. 104-287, Oct. 11, 1996, 110 Stat. 3388.

Recent congressional action to clarify the preemptive sweep of other railway laws also indicates that Congress's seeming acquiescence to the Sixth Circuit's opinion was not merely the result of an oversight on Congress's part. In 2007, Congress amended the Federal Railroad Safety

Act's preemption provision in order to clarify that state-law causes of action seeking damages for injuries stemming from a violation of railway safety or security standards were not preempted. *49 U.S.C. § 20106(b)*. This amendment was passed in response to the Eighth Circuit's conclusion that the Federal Railroad Safety Act preempted state law personal injury claims related to a train derailment in Minot, North Dakota. *Lundeen v. Canadian Pacific Railway Co., 07-1656, 532 F.3d 682, 2008 U.S. App. LEXIS 14210, *6-*12 (8th Cir. July 2, 2008)* [*35] (discussing this history, including that Court's earlier decision in *Lundeen v. Canadian Pacific Railway Co., 447 F.3d 606, 615 (8th Cir. 2006)*). As already noted, no similar action followed the Sixth Circuit's opinion.

Although we have arrived at our conclusion that federal law preempts the applicability of Illinois's overtime law to interstate railroads independent of Congress's apparent acquiescence to *R.J. Corman Railroad Co.*, Congress's actions subsequent to that opinion reaffirm our decision to join our sister Circuit in holding that field preemption is applicable in this circumstance.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment for WCL and denial of summary judgment for the IDOL on the alternate ground that federal law preempts *820 ILL. COMP. STAT. 105/4a*'s applicability to interstate railroads like WCL, and REMAND for the district court to dismiss Counts 3 and 4 for want of jurisdiction and issue an injunction and declaration consistent with this opinion as to Counts 1 and 2.